

**U.S. BANKRUPTCY COURT**

**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**

**THE DATE OF ENTRY IS**

**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 5, 2013**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| TUSA-EXPO HOLDINGS, INC., OFFICE EXPO, | § | |
| INC., AND TUSA OFFICE SOLUTIONS, INC. | § | CASE NO.: 08-45057-DML-7 |
| DEBTORS. | § | (JOINTLY ADMINISTERED) |
| | § | |
| MARILYN D. GARNER, CHAPTER 7 TRUSTEE | § | |
| FOR TUSA OFFICE SOLUTIONS, INC., | § | |
| PLAINTIFF, | § | |
| | § | ADVERSARY NO. 10-04271-DML |
| V. | § | |
| | § | |
| KNOLL, INC. | § | |
| DEFENDANT. | § | |

## <u>MEMORANDUM OPINION</u>

Before the court is the *First Amended Complaint of the Trustee Against Knoll, Inc.* (the

"Amended Complaint") filed by Marilyn D. Garner as chapter 7 trustee (the "Trustee") at docket

no. 17[1] and *Knoll, Inc.'s Original Answer to First Amended Complaint of the Trustee Against*

*Knoll, Inc.* (the "Original Answer") filed by Knoll, Inc. ("Knoll") at docket no. 19.

---

[1]    "Docket no. __" shall hereinafter refer to documents filed in the above-captioned adversary proceeding (the
"Adversary Proceeding").

As a threshold matter, the court determined that, pursuant to Federal Rule of Bankruptcy Procedure[2] 7042, bifurcation of issues presented in the Amended Complaint was necessary to expedite and economize the Adversary Proceeding.  Therefore, at the court's invitation, Knoll and the Trustee (together, the "Parties") submitted supplemental briefs, which solely addressed certain pre-petition activities between Tusa Office Solutions, Inc. ("Tusa Office" or "Debtor") and Knoll alleged in the Amended Complaint.[3]  The court heard argument from the Parties, testimony from witnesses,[4] and admitted numerous exhibits into evidence in a series of hearings (the "Bifurcated Trial")[5] regarding whether the estate was diminished by virtue of the prepetition activities.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(F), (K).  This memorandum opinion constitutes the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

---

[2]    "Rule" shall hereinafter refer to the Federal Rules of Bankruptcy Procedure.

[3]    The court will address these issues in detail below.

[4]    Specifically, the court heard testimony and/or admitted deposition testimony from the following individuals:

      Charles Tusa, former owner and representative of Tusa Office;
      Wally Perez, former VP of accounting at Tusa Office and former CFO of Tusa-Expo Holdings, Inc.;
      Marilyn D. Garner, Trustee;
      Ken Hartley, former controller at Tusa Office;
      Jerry Retsky, former accounts payable at Tusa Office;
      William Tully, manager of credit collections at Knoll;
      Gary Jay, distribution development manager at Knoll;
      John Tittle, expert witness for Knoll; and
      Paul French, expert witness for Trustee.

[5]    The Bifurcated Trial was held on the following dates: August 13, 14, and 15, 2012; September 27, 2012; November 15 and 27, 2012; January 23, 24, and 28, 2013.

References to the transcripts of the Bifurcated Trial will hereinafter be cited as TR *(name of witness)*, pg(s). __ *(date of testimony)*.

Exhibits that have been admitted in connection with the Bifurcated Trial will hereinafter be cited as "Name of Party, Tr. Ex., pg(s). __."

## I. Background

In November 1997, a group of investors, led by Charles Tusa, purchased the company that became Tusa Office. Prior to filing bankruptcy, Tusa Office operated a full service office furniture dealership from November 1997 until it ceased business operations on December 19, 2008.[6]

On April 30, 2002, Tusa Office entered into an agreement (the "First Payment Agreement") with Knoll, a company that manufactures and sells office furniture and related products, and thereby became a certified dealer of Knoll products.[7] The First Payment Agreement granted Knoll a security interest in, among other things, all of Tusa Office's assets and after-acquired assets, including accounts receivable.[8]

A typical transaction between Tusa Office and a customer would proceed as follows: Tusa Office would receive a purchase order from a customer. Tusa Office would then order the product it needed to fulfill the customer's purchase order from Knoll on credit terms. Upon receipt of the product from Knoll, Tusa Office would install the product at a place designated by the customer and subsequently bill the customer for the product (at a markup) in addition to any related installation charges. During their relationship, Tusa Office became one of the largest dealers of furniture manufactured by Knoll in North America.[9]

---

[6]    TR *Charles Tusa*, pg. 21 (Aug. 13, 2012).

[7]    Knoll's Tr. Ex. X.

[8]    Knoll's Tr. Ex. X, pg. 3, ¶ B; TR *William Tully*, pgs. 39-40 (Sept. 27, 2012).

      The First Payment Agreement was subsequently amended on June 19, 2003, December 2, 2003, and August 8, 2005 (together, the "Prior Agreement"). Pursuant to the Prior Agreement, Tusa Office had a credit limit in the amount of $3,500,000.00 with Knoll.

[9]    "[Tusa Office] was the largest Knoll dealer in the Dallas-Fort Worth market. We were the fourth-largest Knoll dealer in North America . . . ." TR *Charles Tusa*, pg. 23 (Aug. 13, 2012).

In addition to selling product through dealers (such as Tusa Office), Knoll would occasionally enter into contracts ("Direct Bill Contracts") to sell product directly to customers ("Direct Bill Customers").[10]  Knoll would then enter into a sub-contract with a dealer to provide certain services for Knoll in connection with the Direct Bill Contracts.  Knoll would generally compensate dealers for their services rendered in connection with the Direct Bill Contracts in the form of a merchandise credit or cash payment.[11]

In 2005, in an attempt to diversify its business, Tusa Office acquired a retail pre-owned furniture dealership by the name of Office Expo, Inc. ("Office Expo").[12]  In 2005, the shareholders of Tusa Office and Office Expo entered into an agreement to form Tusa-Expo Holdings, Inc. ("Holdings") as a holding company to acquire all of the stock of Tusa Office and Office Expo.  As a result, Tusa Office and Office Expo became wholly-owned subsidiaries of Holdings.  Following the acquisition of Office Expo and the formation of Holdings, Tusa Office remained one of the largest dealers of Knoll product and continued to enter into transactions with customers pursuant to the Prior Agreement.

Unfortunately, Office Expo was never able to attain the same level of success that Tusa Office achieved.[13]  Due to Office Expo's underperformance, Tusa Office began to use its own revenue to assist Office Expo's operations.[14]  Tusa Office would send Office Expo cash on a

---

[10]     *Knoll's Tr. Brief for Bifurcated Trial on Counts I and II of the Amended Complaint* (hereinafter, "Knoll's Tr. Brief for Bifurcated Trial"), at docket no. 147, pg. 5.

[11]     Knoll's Tr. Brief for Bifurcated Trial, at docket no. 147, pg. 5. *See also* TR *William Tully*, pg. 43 (Sept. 27, 2012).

[12]     TR *Charles Tusa*, pg. 23 (Aug. 13, 2012).

[13]     TR *Wally Perez*, pg. 108 (April 30, 2012).

[14]     TR *Charles Tusa*, pg. 91 (Aug. 13, 2012).

weekly basis to pay vendors or make payroll because of Office Expo's "liquidity issues."[15] Despite Tusa Office's profitable operation, the constant intercompany loans began to cause Tusa Office liquidity issues of its own.[16]

On or around November 14, 2007, Knoll and Bank of America ("BofA") entered into a Direct Bill Contract for the purchase of new furniture for an office located at 1201 Main Street, Dallas, Texas (the "BofA Project").[17]  On January 4, 2008, Knoll and Tusa Office entered into a contract whereby Tusa Office would provide design and installation services on Knoll's behalf in connection with the BofA Project (the "Dealer Participation Agreement").[18]  The Dealer Participation Agreement provided that Knoll would compensate Tusa Office for such design and installation services in connection with the BofA Project by the issuance of merchandise credits or cash.[19]

On June 27, 2008, Tusa Office and Knoll agreed to amend the Prior Agreement in order to restructure the debt that Tusa Office owed to Knoll (the "Amended Payment Agreement").[20] Under the Amended Payment Agreement, the maximum amount of debt Tusa Office was

---

[15]     TR *Wally Perez*, pgs. 110-11 (April 30, 2012).

[16]     TR *Wally Perez*, pg. 111 (April 30, 2012).

[17]     Knoll's Tr. Ex. BB, pgs. 3-7; Trustee's Tr. Ex. 21, pgs. 3-7.

[18]     Knoll's Tr. Ex. BB, pgs. 1-2; Trustee's Tr. Ex. 21, pg. 1-2.

[19]     Knoll's Tr. Ex. BB, pgs. 1-2; Trustee's Tr. Ex. 21, pg. 1-2.

         At the time Tusa Office and Knoll entered into the Dealer Participation Agreement, Tusa Office's credit limit with Knoll was $3,500,000.00.   TR *Charles Tusa*, pg. 27 (Aug. 13, 2012).

[20]     Knoll's Tr. Ex. Z; Trustee's Tr. Ex. 19.

         At the time Tusa Office and Knoll entered into the Amended Payment Agreement, Tusa Office's credit limit with Knoll had already been raised to $5,000,000.00; however, the increase in credit was not memorialized until the Amended Payment Agreement was executed.  TR *William Tully*, pg. 120 (Aug. 13, 2012).  Notwithstanding the Amended Payment Agreement, Tusa Office was over its credit limit with Knoll.

allowed to incur for invoices fewer than 90 days past invoice date (the "Current Indebtedness") was not to exceed $3,100,000.00 until the amount of debt for invoices more than 90 days past invoice date (the "Past-Due Indebtedness") was less than $1,900,000.00.[21] Additionally, the Amended Payment Agreement reasserted Knoll's first-priority security interest in substantially all of Tusa Office's present and after-acquired assets ("Knoll's Collateral").[22]

At the time Tusa Office and Knoll entered into the Amended Payment Agreement, Tusa Office's total Current Indebtedness was $2,863,898.60, and its Past-Due Indebtedness was $2,703,955.29.[23]   In order to free up Tusa Office's credit line,[24] the Amended Payment Agreement provided that the amounts Tusa Office was scheduled to earn pursuant to the Dealer Participation Agreement would be directly applied to the Past-Due Indebtedness.[25]   Effectively, Tusa Office would invoice Knoll for work performed pursuant to the Dealer Participation Agreement and Knoll would pay such invoice by issuing a credit memo to Tusa Office.[26]   Each credit memo referenced the corresponding invoice that Tusa Office sent to Knoll and indicated that such amount was credited to Tusa Office's account.[27]

---

[21]   Knoll's Tr. Ex. Z, pg. 4, § 2.01(a); Trustee's Tr. Ex. 19, pg. 4, § 2.01(a).

[22]   Knoll's Tr. Ex. Z; Trustee's Tr. Ex. 19; *see also* TR *William Tully*, pg. 40 (Sept. 27, 2012).

[23]   Knoll's Tr. Ex. Z, pg. 1, ¶ D; Trustee's Tr. Ex. 19, pg. 1, ¶ D.

[24]   Under the Amended Payment Agreement, the "Current Indebtedness . . . shall not exceed an amount equal to $5,000,000.00 <u>less</u> the amount of the Past-Due Indebtedness . . ." *See* Knoll's Tr. Ex. Z, pg. 4, § 2.01(a); Trustee's Tr. Ex. 19, pg. 4, § 2.01(a).  In other words, Tusa Office's ability to increase the Current Indebtedness to an amount in excess of $3,100,000.00 was dependent upon its ability to reduce the Past-Due Indebtedness to an amount lower than $1,900,000.00.

[25]   Knoll's Tr. Ex. Z, pg. 4, § 2.02; Trustee's Tr. Ex. 19, pg. 4, § 2.02.

[26]   Knoll's Tr. Ex. Z, pg. 4, § 2.02(a); Trustee's Tr. Ex. 19, pg. 4, § 2.02(a).

[27]   *See, e.g.*, Trustee's Tr. Ex. 49.

In addition to restructuring its debt with Knoll, Tusa Office began to search for additional financing to continue its operations. On July 10, 2008, Tusa Office and Textron Financial, Inc. ("Textron") entered into the Loan and Security Agreement (the "Textron Loan Agreement").[28] The Textron Loan Agreement provided Tusa Office a revolving credit line of $6,500,000.00 in exchange for a first-priority security interest in all of Tusa Office's assets, including Knoll's Collateral.[29] The Textron Loan Agreement also required that Tusa Office's customers send payments directly to an account maintained by Textron (the "Lock Box").[30]

Prior to the Textron Loan Agreement, Knoll and Textron entered into a subordination agreement (the "Subordination Agreement") which established that the Textron Loan Agreement would be subject to a "carve-out" in favor of Knoll.[31] Specifically, the Subordination Agreement modified the Textron Loan Agreement such that "any amount owed by [Knoll] to [Tusa Office], whether by offset or otherwise, shall never be [j]unior [l]iabilities and are not subordinated or otherwise affected by this [a]greement."[32] In other words, Knoll retained its first-priority security interest in any amount Knoll owed to Tusa Office, but Textron retained a first-priority security interest in the remainder of Tusa Office's assets.

Thereafter, pursuant to the Textron Loan Agreement, each receivable that Tusa Office generated was paid into the Lock Box.[33] Textron swept the Lock Box daily and applied the

---

[28]   Knoll's Tr. Ex. DD; Trustee's Tr. Ex. 20.

[29]   Knoll's Tr. Ex. DD; Trustee's Tr. Ex. 20.

[30]   Knoll's Tr. Ex. DD, pg. 5, ¶ 5.1; Trustee's Tr. Ex. 20, pg. 5, ¶ 5.1.

[31]   The effective date of the Subordination Agreement was July 9, 2008. Knoll's Tr. Ex. EE; Trustee's Tr. Ex. 24. On July 10, 2008, Tusa Office acknowledged and agreed to be bound by the terms of the Subordination Agreement. Knoll's Tr. Ex. EE, pg. 7; Trustee's Tr. Ex. 24, pg. 7.

[32]   Knoll's Tr. Ex. EE, pg. 1, ¶ 1; Trustee's Tr. Ex. 24, pg. 1, ¶ 1.

[33]   Trustee's Tr. Brief, at docket no. 141, pg. 6.

funds to reduce Tusa Office's loan balance.[34]  When Tusa Office needed operating funds, it submitted a borrowing base certificate to Textron.[35]  Upon receipt of the borrowing base certificate from Tusa Office, Textron would deposit funds into Tusa Office's operating account at Legacy Bank (the "Operating Account").[36]  Tusa Office would then use funds from the Operating Account to, among other things, make payroll, pay rent, and purchase product from Knoll.[37]

On October 24, 2008, Knoll, Textron, and Tusa Office entered into the First Amendment to Subordination Agreement (the "Amended Subordination Agreement").[38]  The Amended Subordination Agreement expanded Knoll's rights to include senior liens on receivables owed to Tusa Office by Haynes & Boone, LLP ("Haynes & Boone") and Rosewood Corporation ("Rosewood").[39]  Therefore, Knoll, in addition to retaining its first-priority security interest in any amounts it owed to Tusa Office, now retained a first-priority security interest in receivables that Haynes & Boone and Rosewood owed to Tusa Office.[40]

Notwithstanding Tusa Office's efforts to restructure its debt and obtain additional financing, Tusa Office's financial resources remained constrained due to its continued efforts to keep Office Expo afloat.[41]  Standing alone, Tusa Office remained a profitable company with a

---

[34]     Knoll's Tr. Ex. DD, pg. 5, ¶ 5.2; Trustee's Tr. Ex. 20, pg. 5, ¶ 5.2.

[35]     Knoll's Tr. Ex. DD, pg. 1, ¶ 1.2; Trustee's Tr. Ex 20, pg. 1, ¶ 1.2.

[36]     Knoll's Tr. Ex. DD, pg. 1, ¶ 1.2; Trustee's Tr. Ex. 20, pg. 1, ¶ 1.2.

[37]     TR *Charles Tusa*, pg. 38 (Aug. 13, 2012).

[38]     Knoll's Tr. Ex. FF; Trustee's Tr. Ex. 30.

[39]     Knoll's Tr. Ex. FF, pg. 1, ¶¶ (B)(2), (3); Trustee's Tr. Ex. 30, pg. 1, ¶¶ (B)(2), (3).

[40]     Knoll's Tr. Ex. FF, pg. 1, ¶¶ (A), (B)(2); Trustee's Tr. Ex. 30, pg. 1, ¶¶ (A), (B)(2).

[41]     See *supra* note 16 and accompanying text.

growing market share,[42] but continued to experience dire cash flow problems due, in large part, to the revenue it was funneling to Office Expo.[43]

On October 31, 2008, Office Expo[44] and Holdings[45] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Code").[46]

On November 5, 2008 (the "Petition Date"), Tusa Office filed its own voluntary petition for relief under chapter 11 of the Code.[47]  The following day, the court entered an order directing the procedural consolidation and joint administration of the bankruptcy cases of Holdings, Office Expo, and Tusa Office, under case no. 08-45057 (the "Bankruptcy Case").[48]  Shortly thereafter, on January 30, 2009, Knoll filed its proof of claim in the amount of $6,929,783.87 in the

---

[42]    TR *Wally Perez*, pgs. 22-23, 30 (April 30, 2012); TR *Charles Tusa*, pgs. 96-98 (Aug. 13, 2012); TR *Paul French*, pgs. 159-160 (Aug. 14, 2012); TR *Ken Hartley*, pgs. 138-39 (Aug. 15, 2012); TR *William Tully*, pgs. 175-76 (Aug. 13, 2012); TR *John Tittle*, pgs 75-76 (Nov. 15, 2012).

[43]    The underperformance of Office Expo "was certainly one of the reasons, and may have been one of the main reason . . . that Tusa Office filed [bankruptcy]." TR *Charles Tusa*, pg. 90 (Aug. 13, 2012). "It is my opinion that [Tusa Office's] profits were swallowed whole by the other two divisions, neither of which were making money." TR *Ken Hartley*, pg. 153 (Aug. 15, 2012). The reason Tusa Office had cash constraints was because "of the monies that had been used to fund Office Expo." TR *William Tully*, pg. 195 (Aug. 13, 2012). "The historical drain to [Office] Expo had a . . . a very negative impact on [Tusa Office] . . ." TR *Paul French*, pg. 160 (Aug. 14, 2012).

[44]    Bankruptcy case no. 08-45056-dml-11.

[45]    Bankruptcy case no. 08-45057-dml-11.

[46]    11 U.S.C. §§ 101 *et. seq.*

[47]    Bankruptcy case no. 08-45275.

[48]    The court will hereinafter refer to documents filed in the Bankruptcy Case as "Bankruptcy Case, docket no. ___."

Bankruptcy Case.[49]  On July 16, 2009, upon Debtors' motion,[50] the court converted the Bankruptcy Case from a case under chapter 11 to one under chapter 7.[51]

In the months leading up to the Petition Date, Tusa Office continued to order product from Knoll pursuant to the Amended Payment Agreement to fulfill orders it received.  Likewise, Knoll continued to ship product and subsequently invoice Tusa Office for each order it shipped (the "Prepetition Invoices").[52]  In turn, Tusa Office continued to make payments to Knoll from the Operating Account to satisfy the Prepetition Invoices.

On November 4, 2010, the Trustee filed the Adversary Proceeding.[53]  By filing the Adversary Proceeding, the Trustee seeks to, among other things,[54] avoid as preferential transfers

---

[49]     Bankruptcy Case, Claims Register, Claim no. 60.

[50]     Bankruptcy Case, docket no. 227.

[51]     Bankruptcy Case, docket no. 244.  On the same date, the United States Trustee appointed the Trustee to oversee the administration of the Bankruptcy Case.  *See* 11 U.S.C. § 701.

[52]     The dates of the invoices in question range from May 26, 2008 to November 4, 2008.  *See* Amended Complaint, at docket no. 17, Ex. B.

[53]     *Original Complaint of the Trustee against [Knoll]*, at docket no. 1.

In her Amended Complaint, the Trustee alleges the following claims for relief:

    Count I: Avoidance of prepetition payments pursuant to Code section 547.

    Count II: Avoidance of prepetition transfers relating to the BofA Project pursuant to Code section 547.

    Count III: Avoidance of postpetition transfers relating to the BofA Project pursuant to Code section 549.

    Count IV: Avoidance of security interests in Tusa Office's deposit accounts pursuant to Code section 544(a).

    Count V: Avoidance of setoffs and request for damages pursuant to Code section 362(k).

    Count VI: Avoidance of a postpetition wire payment pursuant to Code section 549.

    Count VII: Recovery of avoided transfers pursuant to Code section 550.

*See* Amended Complaint, at docket no. 17.  As mentioned above, the Court will only address matters relating to Counts I and II in this Memorandum Opinion.

the payments made by Tusa Office to Knoll relating to the Prepetition Invoices in the total

amount of $4,592,483.90.[55]   The Trustee also seeks to avoid as preferential transfers assignments

of receivables made by Tusa Office to Knoll in the amount of $1,161,669.97 (the "Preference

Period Receivables").[56]   Alternatively, the Trustee alleges that the transfers of the Preference

Period Receivables are avoidable under Code section 553(b) as impermissible setoffs.[57]

On December 6, 2010, Knoll filed the *Motion to Dismiss Plaintiff's Complaint Pursuant

to [Federal Rule of Civil Procedure] 12(b)(6)* ("Knoll's Motion to Dismiss") at docket no. 5.[58]

On January 3, 2011, the court held a hearing and granted Knoll's Motion to Dismiss with respect

to Counts I and V without prejudice to amendment and denied the Motion to Dismiss with

respect to Counts II, III, VI, and VII.[59]

---

[54]     *See supra* note 53.

[55]     Amended Complaint, at docket no. 17, pg. 3; *see also* Code § 547.

[56]     Trustee's Tr. Brief, at docket no. 141, pg. 15.

[57]     *Id*.; *see also* Code § 553(b), which provides:

> (b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of--
>
> (A) 90 days before the date of the filing of the petition; and
>
> (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
>
> (2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

[58]     In the Motion to Dismiss, Knoll sought to dismiss counts I, II, III, V, VI, and VII of the Amended Complaint for failure to state a legal claim upon which relief could be granted.  *See* Docket nos. 5 & 6.

[59]     The merit of Count IV was not before the court and therefore the court did not address it. TR of Hearing on Motion to Dismiss, at pg. 37 (Jan. 3, 2011); *see also Order Granting in Part and Denying in Part Motion to Dismiss Plaintiff's Complaint Pursuant to[Federal Rule of Civil Procedure] 12(B)(6)*, at docket no. 14.

On April 11, 2011, Knoll filed *Knoll['s] First Amended Counterclaim Against [Tusa Office]* (the "Amended Counterclaim"), at docket no. 25. On May 2, 2011, the Trustee filed *Trustee's Motion to Dismiss Knoll['s] Amended Counterclaim*, (the "Trustee's Motion to Dismiss"), at docket no. 26, whereby the Trustee alleged Knoll failed to state a claim upon which relief may be granted. On May 13, 2011, the Trustee filed the *Trustee's Motion for Partial Summary Judgment* (the "Trustee's Motion for Summary Judgment"), at docket no. 30, seeking summary judgment with respect to Counts I and II of her Amended Complaint.

On June 14, 2011, the court held a hearing regarding the Trustee's Motion to Dismiss and Trustee's Motion for Summary Judgment (together, the "Trustee's Motions"). At the conclusion of the hearing, the court took the Trustee's Motions under advisement. On November 29, 2011, the court issued a letter ruling denying the Trustee's Motions.[60] In doing so, the court determined that there were genuine issues of material fact to be resolved with respect to Claims I and II.[61]

On September 30, 2011, Knoll filed its *Motion for Partial Summary Judgment* ("Knoll's Motion for Summary Judgment"), at docket no. 68. In Knoll's Motion for Summary Judgment, Knoll requested that the court grant summary judgment in its favor with regard to Counts II, III, V, and VI of the Amended Complaint.[62] On January 25, 2012, the court heard argument regarding Knoll's Motion for Summary Judgment and took the matter under advisement.

On April 4, 2012, the court held a status conference (the "Status Conference") with the Parties regarding Knoll's Motion for Summary Judgment and the current state of the Adversary

---

[60]     The court reserved the "right to give more detailed explanation of [such] conclusions, as necessary, at trial or in a later opinion." *See* docket no. 98, at pg. 2.

[61]     Additionally, the court found that the Trustee's Motion to Dismiss was improper because Knoll stated claims upon which relief may be granted. *Id*.

[62]     Docket no. 68.

Proceeding.  At the Status Conference, the court determined that, given the number of issues presented and litigation associated with the Adversary Proceeding, it would be beneficial to the court and to the Parties moving forward to narrow the scope of the issues before the court.  In that vein, the court requested the Parties solely address the issue of whether the alleged prepetition transfers diminished Debtor's estate at the Bifurcated Trial.  Further, the court decided that it would defer its ruling on Knoll's Motion for Summary Judgment or any other pleading associated with the Adversary Proceeding until the issue of diminution was determined.

On September 18, 2012, the court issued a letter requesting that the Parties present specific evidence regarding the amount that Knoll would have recovered had Tusa Office filed a case under chapter 7 of the Code.  Specifically, the court requested that the Parties furnish the court with the amount Knoll would have recovered had Tusa Office been liquidated on August 7, 2008 (the "Preference Date"), November 5, 2008 (the Petition Date), and on or about December 19, 2008 (the date Tusa Office ceased operations).

On February 11, 2013, Knoll filed its *Motion for Leave to Amend Answer and Brief in Support Thereof* (the "Motion for Leave to Amend").[63]  In the Motion for Leave to Amend, Knoll requested that the court grant Knoll leave to amend the Answer to plead Code section 547(c)(5) as an affirmative defense to Count I of the Trustee's Amended Complaint.[64]  On

---

[63]    Docket no. 201.

[64]    Code section 547(c)(5) states in relevant part:

(c) The trustee may not avoid under this section a transfer –

. . .

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of--

March 7, 2013, the Trustee filed her *Response Opposed to the [Motion for Leave to Amend]*.[65]

On April 10, 2013, the court held a hearing on the Motion for Leave to Amend. At the hearing,

the court granted the Motion for Leave to Amend and the Parties submitted post-trial briefs with

respect to 547(c)(5)'s applicability to Count I.

## II. Discussion

"A preference is a transfer that enables a creditor to receive a payment of a greater

percentage of his claim against the debtor than he would have received if the transfer had not

been made and he had participated in the distribution of the assets of the bankrupt estate." *Union

Bank v. Wolas*, 502 U.S. 151, 160-61 (1991) (quoting H.R. Rep. No. 95-595, 177-78 (1977)). "It

is the ultimate aim of the preference law in the [Code] to insure that all creditors receive an equal

distribution from the available assets of the debtor." *Gill v. Winn (In re Perma Pacific Props.)*,

983 F.2d 964, 968 (10th Cir. 1992) (citing *Johnson v. Barnhill (In re Antweil)*, 931 F.2d 689, 692

(10th Cir. 1991)). The elements of a preference are set out in section 547(b) of the Code, which

provides that:

> **(b)** Except as provided in subsections (c) and (i) of this section, the trustee
> may avoid any transfer of an interest of the debtor in property--
>
> > **(1)** to or for the benefit of a creditor;
> >
> > **(2)** for or on account of an antecedent debt owed by the debtor
> > before such transfer was made;
> >
> > **(3)** made while the debtor was insolvent;
> >
> > **(4)** made--
> >
> > > **(A)** on or within 90 days before the date of the filing of the
> > > petition; or

---

(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the
date of the filing of the petition.

[65]    Docket no. 203.

        **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    **(5)** that enables such creditor to receive more than such creditor would receive if--

        **(A)** the case were a case under chapter 7 of [the Code];

        **(B)** the transfer had not been made; and

        **(C)** such creditor received payment of such debt to the extent provided by the provisions of [the Code].

Further, Congress has indicated that:

The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R. Rep. No. 95-595, 177-78 (1977).  Therefore, a prepetition payment made to an unsecured creditor "will almost always result in a preferential transfer unless, in the rare circumstance, the estate has sufficient assets to provide a 100% distribution." *Yoppolo v. Comerica Bank (In re Norwalk Furniture Corp.*, 428 B.R. 419, 425 (Bankr. N.D. Ohio 2009) (citing *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir. 1991)).

"These concerns apply to a lesser degree to creditors with fully secured claims." *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Supply & Terminaling, Inc.)*, 837 F.2d 224, 227 (5th Cir. 1988).  "A fully secured creditor is not required to share with other creditors on a pro rata basis because the collateral underlying his secured interest entitles him to the value

of his claim, and the incentive to dismember a financially unsound debtor is reduced by the assurance of certain payment." *Id.*

Pursuant to 547(b)(5) of the Code, a trustee must establish that the challenged payments enabled the creditor to receive more than the creditor would have received upon liquidation under chapter 7 of the Code in order to avoid a pre-petition payment as a preference. *See Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229 (1936); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1034 (5th Cir. 1987). "This test is often referred to as the 'greater percentage test' or the 'improvement in position' test." *Unsecured Creditors Comm. v. Cmty. Bank (In re Stinson Petroleum Co., Inc.)*, 506 F. App'x 305, 308 (5th Cir. 2013).

"This analysis requires the court to construct a hypothetical Chapter 7 liquidation and determine what the creditor would have received had the transfers not taken place." *Lowe v. Palmetco Inc. (In re N.A. Flash Found. Inc.)*, 298 F. App'x 355, 359 (5th Cir. 2008) (citing *Cunningham v. T&R Demolition, Inc. (In re ML & Assocs., Inc.)*, 301 B.R. 195, 202 (Bankr. N.D. Tex. 2003)). "In constructing a hypothetical Chapter 7 case, [courts] are to assume that all persons would act in a commercially reasonable and businesslike manner." *In re N.A. Flash Found. Inc.*, 298 F. App'x, at 359. Further, in order for a preferential transfer to be avoided, a trustee must prove that such transfers depleted the estate. *Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 460 (5th Cir. 2006). "This simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-à-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.'" *Hager v. Gibson* 109 F.3d 201, 210 (4th Cir. 1997) (citing *Smith v. Creative Fin. Mgmt., Inc. (In re Va.-Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992)).

*A. Count I*

In Count I, the Trustee seeks to avoid $4,592,483.90 in payments relating to the

Prepetition Invoices (the "Preference Period Payments") made by Debtor to Knoll between

August 6, 2008, and November 5, 2008 (the "Preference Period").[66]

The Trustee contends that the applicable standard to determine whether Knoll received

more as result of the Preference Period Payments than it would have received in a hypothetical

chapter 7 liquidation is set out by the Fifth Circuit in *Krafsur v. Scurlock Permian Corp. (In re El

Paso Refinery, LP)*, 171 F.3d 249 (5th Cir. 1999).  The Trustee suggests that under *El Paso

Refinery*, the court need not perform a hypothetical liquidation analysis to determine whether

Knoll received a voidable preference, but only determine (1) to what portion of Knoll's claim the

Preference Period Payments were applied, and (2) whether the source of the Preference Period

Payments was Knoll's Collateral.[67]

Knoll contends that the Trustee's reliance on *El Paso Refinery* is misplaced and that the

Code <u>requires</u> the Trustee to prove that section 547(b)(5) is satisfied through the construction of

a complete hypothetical chapter 7 liquidation.[68]

The court need not determine which approach is more appropriate today because the

court's conclusion remains the same under either analysis; Knoll's receipt of the Preference

Period Payments did not result in a voidable preference.

*1.      In re El Paso Refinery*

The Trustee contends that the court must find that the Preference Period Payments were

indeed preferential transfers upon the Trustee's satisfaction of the test set out in *El Paso

---

[66]      *See* Amended Complaint, at docket 17, pg. 3 & Ex. B.

[67]      Trustee's Tr. Brief, docket no. 141, pgs. 13-14.

[68]      Knoll Tr. Brief, docket no. 147, pg. 18.

*Refinery*.  In *El Paso Refinery*, the Fifth Circuit opined that "[t]o determine whether an

undersecured creditor received a greater percentage recovery on its debt than it would have under

chapter 7 the following two issues must first be resolved: (1) to what claim the payment is

applied and (2) from what source the payment comes." *In re El Paso Refinery, LP*, 171 F.3d at

254 (citing *In re El Paso Refinery*, 178 B.R. 426, 434 (Bankr. W.D. Tex. 1995)).  These are

known as the "Application Test" and the "Source Test."  The *El Paso Refinery* court went on to

state that "[b]oth aspects must be examined before the issue of greater percentage recovery can

be decided." *In re El Paso Refinery, LP*, 171 F.3d at 254.

> *a.  The Application Test*

Under the application test:

> [i]f a payment is made to an undersecured creditor, [and such payment] is
> applied to the unsecured portion of the debt, then the undersecured
> creditor will have recovered a greater percentage on this claim if the estate
> cannot pay its unsecured creditors 100% of these claims.  In contrast, if
> the undersecured creditor applies the payment to the secured portion of the
> debt, the creditor effectively releases a portion of its collateral from its
> security interest, that is, its secured claim is reduced, freeing up a
> corresponding amount of collateral. In this situation, the creditor does not
> receive a greater percentage recovery. If, however, the creditor does not
> actually release collateral upon application of the payment, then the
> payment is ipso facto a payment on the unsecured portion of the claim.

*In re El Paso Refinery, LP*, 171 F.3d at 254 (citations omitted).

First, it is uncontroverted that Debtor is unable to pay its unsecured creditors 100% of

their claims.  Indeed, Debtor's schedules,[69] and testimony of the Parties' experts,[70] sufficiently

demonstrate that Debtor's unsecured creditors could not be paid in full.

---

[69]    Bankruptcy Case, Docket no. 84.

[70]    TR *Paul French*, pg. 172 (Aug. 13, 2012); TR *John Tittle*, pg. 26 (Jan. 24, 2013).

Second, Knoll did not release collateral upon receiving payments from Debtor. Tusa Office's indebtedness to Knoll was in excess of Knoll's Collateral at all times during the Preference Period. Additionally, the Amended Payment Agreement and the Amended Subordination Agreement state that Knoll's Collateral consists of "all of [Debtor's] personal property so long as there is any debt owed to Knoll."[71] Therefore, Knoll's Collateral remained fully encumbered notwithstanding the application of the Preference Period Payments.

It necessarily follows that because Debtor is unable to pay 100% of unsecured creditor's claims and Knoll did not actually release collateral upon application of the Preference Period Payments, "the payment is ipso facto a payment on the unsecured portion of the claim."[72]

> b. *The Source Test*

In addition to the satisfaction of the Application Test, the Fifth Circuit also requires that a trustee satisfy the "Source Test" before a court can determine that a creditor received a voidable preference. Specifically, the Fifth Circuit stated that:

> Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.

*In re El Paso Refinery, LP*, 171 F.3d, at 254-55 (citations omitted). Therefore, the court must determine whether the source of the Preference Period Payments was Knoll's Collateral.

The Parties do not dispute the fact that proceeds of Knoll's Collateral were deposited in the Lock Box. However, the Trustee asserts that because Textron swept Knoll's Collateral from

---

[71]     Trustee's Tr. Brief, at docket no. 141, pg. 21; *see also* Amended Subordination Agreement, Trustee's Tr. Ex. 30.

[72]     *In re El Paso Refinery, LP*, 171 F.3d at 254.

the Lock Box and applied it to "reduce the indebtedness owed to it by [Debtor]," the subsequent funds Textron released to Tusa Office were new and unencumbered funds for Tusa Office to spend at its own discretion.  The Trustee asserts that the source of the Preference Period Payments was not Knoll's Collateral, but the unencumbered funds periodically given to Tusa Office.  The court rejects this argument for several reasons.

First, Knoll's agreement to enter into the Subordination Agreement with Textron was a "condition precedent to the effectiveness of the [Textron Loan Agreement]."[73]  The Subordination Agreement effectively "induce[d] [Textron] to enter into the [Textron Loan Agreement]" with Tusa Office.[74]  Under the Subordination Agreement, Knoll knowingly relinquished its first lien position with respect to the majority of its collateral with the expectation that Tusa Office would continue to satisfy its obligations under the Amended Payment Agreement.  In fact, under the Textron Loan Agreement, Tusa Office was arguably required to make payments to Knoll pursuant to the terms of the Amended Payment Agreement and the Amended Subordination Agreement.[75]

---

[73]   Subordination Agreement, Knoll's Tr. Ex. EE, pg. 1; Trustee's Tr. Ex. 24, pg. 1.

[74]   Subordination Agreement, Knoll's Tr. Ex. EE; Trustee's Tr. Ex. 24.

[75]   The Textron Loan Agreement provides in pertinent part:

1.1.  Revolving Credit Facility. Provided that there has not been an Event of Default on the part of Borrower under [the Textron Loan Agreement] and Borrower's financial condition and business prospects are acceptable to Lender, Lender will, Subject to the terms and conditions of [the Textron Loan Agreement], make loans to Borrower.

. . .

10.1  Event of Default. The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, shall constitute an "Event of Default" under the [Textron Loan Agreement]:
   . . .

(e)  Borrower defaults: (i) whether as primary or secondary obligor, in the payment of any principal or interest **on any obligation** for borrowed money or other

Second, it is unclear to the court, given Knoll's importance to Tusa Office's continued operation, how funds generated from the disposition of Knoll's Collateral are not direct – or at least indirect – proceeds of Knoll's Collateral.

As the Trustee noted in her brief, Knoll's Collateral consisted of "all of [Debtor's] personal property so long as there is any debt owed to Knoll."[76]  Specifically, included in the description of Knoll's Collateral were liens on all "Inventory, and . . . all Proceeds."[77]  While the Code does not define the term "proceeds," the court will defer to the Amended Payment Agreement by which Knoll and Tusa Office agreed to give all "capitalized terms . . . the meaning given to them by the [Texas Uniform Commercial] Code."[78]

Accordingly, the term "Proceeds" is defined as the following property:

---

indebtedness beyond any applicable grace period or, if such obligation is payable on demand, fails to pay such obligation upon demand

(emphasis added).

Moreover, Section 8.10 of the Textron Loan Agreement states:

Subordinated Debt. Borrower shall not make any payments with respect to any indebtedness that has been subordinated to the Obligations except as and when specifically permitted by the terms of an Intercreditor Agreement.

To this end, Schedule 6.5 in the Textron Loan Agreement, titled "Permitted Prior Encumbrances and Permitted Indebtedness," lists Knoll as a party to an Intercreditor Agreement with a permitted lien on "[a]ll personal property" as set out in the Intercreditor Agreement.

Essentially, Tusa Office was required to pay Knoll or risk default under the Textron Loan Agreement, which would have relieved Textron of any obligation to provide Tusa Office with additional operating funds.  Therefore, while Trustee contends that Tusa Office had unfettered discretion to pay whoever it wanted with the funds in the Operating Account, doing so was certainly not without dire consequences.

[76]    Trustee's Tr. Ex. 19 at pg. 2 § 1.02; Knoll's Tr. Ex. 19 at pg. 2, § 1.02.

[77]    Trustee's Tr. Ex. 19 at pg. 2 § 1.02(i); Knoll's Tr. Ex. 19 at pg. 2, § 1.02(i).

[78]    Trustee's Tr. Ex. 19 at pg. 2 § 1.02; Knoll's Tr. Ex. 19 at pg. 2 § 1.02.

Indeed, it is common for courts to turn to the UCC to determine the meaning of a term not defined in the Code.  *See, e.g.*, *Ford Motor Credit Co., LLC v. Dale (In re Dale)*, 582 F.3d 568, 573 (5th Cir. 2009) (looking to state UCC law to determine the meaning of "purchase-money security interest").

      **(A)** whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

      **(B)** whatever is collected on, or distributed on account of, collateral;

      **(C)** rights arising out of collateral;

      **(D)** to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to the collateral; or

      **(E)** to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to the collateral.

TEX. BUS. & COM. CODE ANN. § 9.102 (West).

It follows that under the Amended Payment Agreement, by granting Knoll a security interest in "proceeds," Tusa Office granted Knoll a security interest in "whatever is acquired upon the . . . exchange, or other disposition of" Knoll's Collateral. In this case, it is clear that Tusa Office acquired funds from Textron upon the disposition of Knoll's Collateral.

Therefore, pursuant to the four corners of the Amended Payment Agreement and in accordance with the Texas Business and Commerce Code, Knoll retained a security interest in the "proceeds" generated by the disposition of Knoll's Collateral. Even if the Preference Period Payments in question were applied to the unsecured portion of Knoll's claim, Knoll cannot be deemed to have received a greater percentage as a result of the Preference Period Payments under *El Paso Refinery* because Knoll's Collateral is the source of the Preference Period Payments.

      2.    *Hypothetical Chapter 7 Liquidation Analysis*

The Trustee did not satisfy her burden to prove that Knoll received more as a result of the Preference Period Payments than it would have received in a hypothetical liquidation.

"The plain meaning of legislation should be conclusive, except in rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions

of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Code section 547(b)(5), in straightforward language, requires the avoidance of transfers that enable a creditor to receive more than it would have received in a hypothetical chapter 7 liquidation. "Determining what constitutes 'more' is a simple mathematical determination that can be easily calculated by a 'reasonable businessperson.'" *In re Villarreal*, 413 B.R. 633, 640 (Bankr. S.D. Tex. 2009) (quoting *Newman v. FIBSA Forwarding, Inc. (In re FIBSA Forwarding, Inc.)*, 230 B.R. 334, 337-38 (Bankr. S.D. Tex. 1999), *aff'd*, 244 B.R. 94 (S.D. Tex. 1999)). While the court must rely on experts in deciding the appropriate methodology, it "must use its own judgment in fitting the evidence with the methodology." *See, e.g.*, *In re Mirant Corp.*, 334 B.R. 800, 838 n.134 (Bankr. N.D. Tex. 2005).

Based on the evidence presented at the Bifurcated Trial, the court has determined that Tusa Office's hypothetical liquidation value on the Petition Date was $9,713,392.00.[79] On the Petition Date, Tusa Office's secured claims consisted of: (1) tax claims in the amount of $653,137.00 (the "Tax Claims"),[80] (2) Textron's claim in the amount of $4,322,501.00,[81] and (3) Knoll's Claim in the amount of $6,929,784.00.[82]

---

[79]   This valuation was calculated by taking the book value of each asset owned by Tusa Office as of the Petition Date and multiplying each book value by an estimated percentage of recoverability in a hypothetical liquidation. Additionally, based on a conservative estimate, the costs associated with liquidating Tusa Office's assets would be $1,091,271.00, which represents 10.1% of the hypothetical estate. This valuation reflects the subtraction of those costs.

[80]   The Tax Claims consist of (1) state sales tax in the amount of $636,773.00, and (2) ad valorem tax in the amount of $16,364.00. $636,773.00 + $16,364.00 = $653,137.00.

[81]   The full amount of Textron's claim was secured by a first priority lien on substantially all of Tusa Office's assets.

[82]   Knoll's claim in the amount of $6,929,784.00 consisted of (i) $3,081,713 secured by first liens in Knoll's Collateral, and (ii) $3,848,071 secured by secondary liens subject to Textron's full satisfaction.

The priority scheme provided by section 507 of the Code is instructive when constructing a hypothetical chapter 7 liquidation to determine how distributions would have been made. Under this priority scheme, $653,137 in Tax Claims would be paid out of the Debtor's estate ahead of general unsecured claims, leaving $9,060,625 to be distributed to Tusa Office's creditors.  Of the $9,060,625 remaining in Debtor's estate, $4,322,501 would be paid to Textron on account of its first priority lien, leaving $4,737,754 remaining in Debtor's estate.  Of the $4,737,754 remaining, $3,081,713 would be paid to Knoll in full satisfaction of its first lien claim, which would leave $1,656,041 in Debtor's estate.  The remaining $1,656,041 would be subject to Knoll's secondary lien and thus the entire amount would be paid to Knoll in partial satisfaction of such secondary lien.

These calculations indicate that Knoll would have received $4,737,754 from Debtor's estate on account of its first and second lien collateral positions.  Therefore, had Knoll kept the Preference Period Payments, it would have received a total amount of $9,330,237.90 had Tusa Office filed a case under chapter 7.[83]

In calculating what Knoll would have received had the Preference Period Payments not been made, the Preference Period Payments must first be returned to Debtor's estate thereby increasing the amount available for distribution to creditors to $14,305,875.90.[84]  As a result of

---

Knoll's secondary lien did not extend to the Operating Account.  This fact alone, however, is not detrimental to the court's analysis as described below.

[83]    $4,737,754 (Knoll's total recovery) + $4,592,483.90 (Preference Period Payments) = $9,330,237.90.

[84]    $9,713,392 (Debtor's liquidation value) + $4,592,483.90 (Preference Period Payments) = $14,305,875.90.

The Trustee contends that if the Preference Period Payments had not been made to Knoll, Debtor would have been able to use funds to pay other creditors throughout the Preference Period, resulting in an amount less than $4,592,483.90 available to distribute on the Petition Date.  Trustee's Tr. Brief, at Docket no. 141, pgs. 25-27.  While the Trustee contends that this scenario would have been a "commercially reasonable" action for the Debtor to take, the court does not agree.  The Trustee seems to ignore the fact that if the Preference Period Payments had not been made, the Debtor would have been in default under the terms of

24

the return of the Preference Period Payments, Knoll's claim against Debtor's estate would thereby increase by an amount equal to the Preference Period Payments.[85]

Utilizing the priority structure described above, it is clear that Knoll would have still been paid $9,330,237.90 had the Preference Period Payments not been made.  To illustrate, $653,137 would still be paid out first to satisfy the Tax Claims, leaving an amount of $13,652,738.90 to be distributed to Tusa Office's creditors.  Of the $13,652,738.90 remaining in Debtor's estate, $4,322,501 would be paid to Textron on account of its first priority lien, leaving an amount of $9,330,237.90 remaining in Debtor's estate.  Of the $9,330,237.90 remaining, $7,674,196.90 of would be paid to Knoll in full satisfaction of its increased first lien claim, which would then leave an amount of $1,656,041 remaining in Debtor's estate.  Again, the remaining $1,656,041 would still be subject to Knoll's secondary lien and thus the entire amount would be paid to Knoll in partial satisfaction of such secondary lien.  So even if the Preference Period Payments were returned to Debtor's estate, Knoll would still have received a distribution in the amount of $9,330,237.90 in a hypothetical chapter 7 liquidation.[86]

Therefore, under this analysis, Knoll would not receive more by keeping the Preference Period Payments than it would under a hypothetical chapter 7 liquidation.

3.    *Diminution of the Estate*

---

the Amended Payment Agreement.  Given the Debtor's dire financial state during the Preference Period, refusing to pay its largest supplier is not a "commercially reasonable" action the court is ready to accept.

[85]    Therefore, Knoll's original claim in the amount of $6,929,784.00 would increase by $4,592,483.90 to $11,522,267.90.  This increased claim would consist of (i) $7,674,196.90 secured by first liens in Knoll's Collateral, and (ii) $3,848,071 secured by secondary liens subject to Textron's full satisfaction.

[86]    $7,674,196.90 + $1,656,041 = $9,330,237.90.

The Preference Period Payments did not diminish Tusa Office's estate because the Preference Period Payments would not have been available to pay Tusa Office's general creditors in a hypothetical liquidation.

"There is no statutory requirement that there be a diminution of the bankruptcy estate. However, such a requirement is implicit in the language of the [Bankruptcy Act section 60(b), predecessor of Code section 547]." *Palmer v. Radio Corp. of Am.*, 453 F.2d 1133, 1136 n.3 (5th Cir. 1971). "[A] transfer of an interest of the debtor in property occurs where the transfer 'diminish[es] directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one.'" *Adams v. Anderson (In re Superior Stamp & Coin Co., Inc.)*, 223 F.3d 1004, 1007 (9th Cir. 2000) (citing *Hansen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313, 316 (9th Cir. 1994)).

On the Petition Date, Tusa Office had $9,713,392.00 in total realizable assets and $11,905,422 in secured liabilities against it.[87]  Because secured liabilities exceeded assets, Tusa Office would not have been able to fully satisfy its secured obligations let alone provide a return to general unsecured creditors.

The Trustee argues that if the Preference Period Payments were returned to the Debtor's estate, it would have resulted in a partial return to general unsecured creditors.[88]  As discussed earlier, [89] this argument rests on a multitude of unfounded assumptions.  Even if the Preference

---

[87]     See *supra* note 79 and accompanying text.

[88]     Trustee's Tr. Brief, at Docket no. 141, pgs. 20-21, 28, 31; *see also* TR *Paul French*, pg. 130-31 (Aug. 14, 2012).

[89]     See *supra* note 84 and accompanying text.

Period Payments had been returned to the Debtor's estate, Debtor would have simply been unable to satisfy all the secured claims against it on the Petition Date.[90]

Therefore, Debtor's estate was not diminished because Knoll's receipt of the Preference Period Payments was not done at the expense of general unsecured creditors.

    4.    *547(c)(5) – The Improvement in Position Test*

In order to determine whether a creditor improved its position, the court must compare the amount of debt outstanding to the value of the collateral securing the debt at the beginning and the end of the preference period. *See Smith v. Assocs. Commercial Corp. (In re Clark Pipe and Supply Co., Inc.)*, 893 F.2d 693 (5th Cir. 1990); *see also* S. Rep. No. 95-989, 88 (1978), *as reprinted in* U.S.C.C.A.N. 5787, 5874. In other words, a creditor will be deemed to have improved its position if its deficiency on the petition date is less than its deficiency 90 days prior to the petition date.

Tusa Office's hypothetical liquidation value on the Preference Date was $7,335,747.[91] At this point, Debtor's secured claims consisted of: (1) Tax Claims of approximately $653,157, (2) Textron's claim in the amount of $2,613,883, and (3) Knoll's claim in the amount of $5,288,924.[92] Accordingly, had the Debtor been liquidated on the Preference Date, Knoll would have received $4,068,727 in partial satisfaction of its claim, which would have resulted in a $1,220,197 deficiency.[93] As discussed in section 1 of this Memorandum Opinion, as an

---

[90]    See *supra* section II. A. 1. of this Memorandum Opinion.

[91]    This valuation was calculated by taking the book value of each asset owned by Tusa Office as of the Preference Date and multiplying each book value by an estimated percentage of recoverability in a hypothetical liquidation. The costs associated with liquidating Tusa Office's assets would be $828,156, which represents 10.1% of the hypothetical estate. This valuation also reflects the subtraction of those costs.

[92]    Knoll Aged Trial Balance Report as of 8/7/08, Trustee's Tr. Ex. 130, pg. 2.

[93]    $7,335,747 – $653,157 (Tax Claims) = $6,682,610.

undersecured creditor, Knoll would have retained a deficiency claim against the Debtor in the amount of $2,192,030 on the Petition Date. [94]

Based on these calculations, Knoll's deficiency increased by $971,833 from the Preference Date to the Petition Date.  Thus, Knoll's secured position did not improve, but actually deteriorated throughout the Preference Period.

### B.  Count II

In Count II, the Trustee seeks to avoid the Preference Period Receivables arising from the BofA Project as preferential transfers made by Tusa Office to Knoll. [95]  Alternatively, the Trustee alleges that the Preference Period Receivables are avoidable under Code section 553(b) as impermissible setoffs. [96]

Knoll's position is that the purpose of the Amended Payment Agreement was not to reduce Knoll's exposure in an anticipated bankruptcy, but to restructure Tusa Office's debt to make room for additional credit. [97]  Further, Knoll asserts that any amount owed to Tusa Office relating to the BofA Project "would have been incurred regardless of whether the Amended Payment Agreement ever existed" and therefore Knoll's liens and right to setoff the Preference Period Receivables is not avoidable under Code section 553(b).

---

$6,682,610 - $2,613,883 (Textron's lien) = $4,068,727.

[94]    Knoll's secured claim as of the Petition Date was $6,929,784.  As noted in *supra* section II. A. 1. of this Memorandum Opinion, Knoll would have received $4,737,754 in a hypothetical liquidation, which would have left a deficiency of $2,192,030.  $6,929,784 - $4,737,754 = $2,192,030.

[95]    Trustee's Amended Complaint, at docket no. 17, pg. 6.

[96]    *See supra* note 57 and accompanying text.

[97]    Knoll's Tr. Brief, docket no. 147, pg. 29-30.

Additionally, Knoll asserts, as an affirmative defense, that it did not improve its position by virtue of its liens on the Preference Period Receivables and/or Tusa Office's assignment of the Preference Period Receivables to Knoll.[98]

1.      *Tusa Office's Rights to the Preference Period Receivables*

The Trustee contends that Tusa Office acquired rights to the Preference Period Receivables during the Preference Period after Tusa Office completed work pursuant to the BofA Project.  The Trustee asserts that at this point Knoll attached liens to the Preference Period Receivables in violation of Code section 547(b).  Additionally, the Trustee contends that because Tusa Office acquired rights in the Preference Period Receivables during the Preference Period, the subsequent assignment of the Preference Period Receivables to Knoll allowed Knoll to receive more than it would have in a chapter 7 liquidation and should be avoided as preferential under Code section 547(b).  The court disagrees.

Code section 547(e)(3) states that "a transfer is not made until the debtor has acquired rights in the property transferred."  Further, under Code section 547(b) "a transfer occurs on the date the contractual right to payment is assigned, not on the date payment is actually made or collected."[99]  "The fact that a right . . . is conditional on the performance of a return promise or is otherwise conditional does not prevent its assignment before the condition occurs."[100] Additionally, "[t]he settled rule of law generally prevailing [is] that a present assignment of an

---

[98]      Knoll's Tr. Brief, docket no. 147, pgs. 30-31.

[99]      *Floyd v. Am. Block Roland Niles Int'l, Inc. (In re Cooper Mfg. Corp.)*, 344 B.R. 496, 513 (Bankr. S.D. Tex. 2006) (citing *Ebert v. Dailey Directional Servs. (In re Gibraltar Res., Inc.)*, 202 B.R. 586, 587(Bankr. N.D. Tex. 1996)).

[100]      RESTATEMENT (SECOND) OF CONTRACTS § 320 (1981).

interest passes the title to it as of the date of the assignment [and] moneys collected under it are the moneys not of the bankrupt, but of the assignee . . . ."[101]

In *Computer Engineering Associates, Inc.*, the First Circuit held that when a debtor assigned all rights, title, and interest in accounts receivables to a subcontractor prior to the preference period, the debtor relinquished all control of the proceeds that the subcontractor received for work completed during the preference period.[102] The First Circuit also noted that, under state law, [103] the right to recover payments of money due or to become due under an existing executory contract, even though conditioned upon future performance, was a present assignable interest.[104] Because the court is faced with a similar legal question, the First Circuit's reasoning in *Computer Engineering* is especially persuasive.

It is clear from the record that Knoll and Bank of America were the only parties to the BofA Project. Tusa Office acquired a right to payment from Knoll **relating** to the BofA Project by entering into the Dealer Participation Agreement with Knoll. At no point in time was Bank of America involved in negotiations with Tusa Office or did it agree to pay Tusa Office directly for work done relating to the BofA Project. Therefore, Tusa Office's only enforceable right to payment was against Knoll and pursuant to the terms outlined in the Dealer Participation Agreement.

---

[101]    *Gamble v. Mathias*, 61 F.2d 911, 911 (5th Cir. 1932).

[102]    *Adv. Testing Technologies, Inc. v. Desmond (In re Computer Eng'g Assocs., Inc.)*, 337 F.3d 38 (1st Cir. 2003).

[103]    The First Circuit interpreted an assignment under New York and Massachusetts state law, which like Texas law, permit the assignment of the right to payment of a monetary obligation, whether or not earned by performance. *See In re Computer Eng'g Assocs., Inc.*, 337 F.3d at 46; Tex. Bus. & Comm. Code §§ 9.102(a)(2), 9.406 (West).

[104]    *In re Computer Eng'g Assocs., Inc.*, 337 F.3d at 46.

Subsequently, in the Amended Payment Agreement,[105] Tusa Office transferred to Knoll "a security interest in . . . [and] without limitation all amounts due . . . to be paid or credited to [Tusa Office]" for work completed pursuant to the Dealer Participation Agreement. At this point, Tusa Office no longer had a right to receive payments from Knoll for work done pursuant to the Dealer Participation Agreement. Therefore, Tusa Office transferred its contractual right to payment and effectively assigned the Preference Period Receivables to Knoll on June 27, 2008, which was well before the start of the Preference Period.[106]

Accordingly, the Preference Period Receivables are not preferential transfers within the plain meaning of Code section 547(b) because Knoll did not receive a transfer of them on or within 90 days before the date of the filing of the petition.

> ### 2. *Knoll Received an Impermissible Setoff*

The Trustee argues that if the Prepetition Receivables are not avoidable as preferential transfers under Code section 547(b), they are avoidable under Code section 553(b) as impermissible setoffs against the estate.

Code section 553(b)(1) provides:

> Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of [the Code], if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of--

> > (A) 90 days before the date of the filing of the petition; and

> > (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

---

[105]     As mentioned above, the Amended Payment Agreement was also entered into prior to the Petition Date.

[106]     The Preference Period began on August 7, 2008.

"The application of this statute is strictly mathematical, and the test is whether the insufficiency on the date of the setoff is less than the insufficiency 90 days before the date of the filing of the petition.  If it is, the difference in the insufficiency . . . is recoverable by the trustee or the debtor."  *Braniff Airways Inc. v. Exxon Co., USA*, 814 F.2d 1030, 1040 (5th Cir. 1987) (citations omitted).  Insufficiency is the "amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim."[107]

Accordingly, the court must assess whether the insufficiency on the date of each challenged setoff is less than the insufficiency that existed 90 days prior to the filing of the petition to determine if Knoll received an impermissible setoff.

On August 7, 2008 (90 days before the date of the filing of the petition) Knoll's insufficiency was $5,183,080.81.[108]  Based on the evidence presented to the court, there were six transactions between Knoll and Tusa Office that occurred between the Preference Period and the Petition Date.[109]  Specifically, these transactions or "offsets" occurred on August 28, 2008, September 12, 2008, September 26, 2008, October 21, 2008, October 29, 2008, and November 5, 2008.[110]

On November 5, 2008, Knoll's insufficiency was $6,779,033.02.[111]  On October 29, 2008, Knoll's insufficiency was $6,497,495.70.[112]  On October 21, 2008, Knoll's insufficiency

---

[107]    Code § 553(b)(2).

[108]    This number is calculated by taking the difference between the amount due to Knoll from Tusa Office on August 7, 2008 ($5,288,924.16) and the amount due to Tusa Office from Knoll on the same date ($105,843.35).  Thus, $5,288,924.16 - $105,843.35 = $5,183,080.81.  Knoll's Tr. Ex. RRRRR, pg. 37; Trustee's Tr. Ex. 127, pg. 1.

[109]    Knoll's Tr. Ex. RRRRR, pg. 37; Trustee's Tr. Ex. 127, pg. 1.

[110]    Knoll's Tr. Ex. RRRRR, pg. 37; Trustee's Tr. Ex. 127, pg. 1.

[111]    On this date, the total amount due to Knoll from Tusa Office was $6,929,783.87 and the total amount due to Tusa Office from Knoll was $150,750.85.  $6,929,783.87 - $150,750.85 = $6,779,033.02.

was $5,973,522.65.[113]  On September 26, 2008, Knoll's insufficiency was $5,331,129.11.[114]  On September 12, 2008, Knoll's insufficiency was $5,401,798.23.[115]  On August 28, 2008, Knoll's insufficiency was $5,077,708.93.[116]

Upon comparison, the only instance in which Knoll's insufficiency was less than its insufficiency 90 days prior to the Petition Date occurred on August 28, 2008.  Thus, the difference between the amount of Knoll's insufficiency on August 28, 2008 ($5,077,708.93) and its insufficiency 90 days prior to the Petition Date ($5,183,080.81) is recoverable by the trustee.[117]  Therefore, under the Fifth Circuit's insufficiency test, Knoll received an impermissible setoff in the amount of $105,371.88.

### III.  Conclusion

To the extent that this Memorandum Opinion is not dispositive of issues contained in the Amended Complaint, the Parties are instructed to contact the court to obtain a future trial date with respect to such remaining issues and designate them as appropriate in a corresponding pre-trial order.

---

[112]  On this date, the total amount due to Knoll from Tusa Office was $6,528,256.97 and the total amount due to Tusa Office from Knoll was $30,761.27.  $6,528,256.97 - $30,761.27 = $6,497,495.70.

[113]  On this date, the total amount due to Knoll from Tusa Office was $6,222,767.13 and the total amount due to Tusa Office from Knoll was $249,244.48.  $6,222,767.13 - $249,244.48 = $5,973,522.65.

[114]  On this date, the total amount due to Knoll from Tusa Office was $5,509,830.96 and the total amount due to Tusa Office from Knoll was $178,701.85.  $5,509,830.96 - $178,701.85 = $5,331,129.11.

[115]  On this date, the total amount due to Knoll from Tusa Office was $6,055,909.35 and the total amount due to Tusa Office from Knoll was $654,111.12.  $6,055,909.35 - $654,111.12 = $5,401,798.23.

[116]  On this date, the total amount due to Knoll from Tusa Office was $5,336,023.30 and the total amount due to Tusa Office from Knoll was $258,314.37.  $5,336,023.30 - $258,314.37 = $5,077,708.93.  Knoll's Tr. Ex. RRRRR, pg. 37; Trustee's Tr. Ex. 127, pg. 1.

[117]  *Braniff Airways Inc.*, 814 F.2d at 1040.